Dear Rep. Bowler:
You have requested an opinion of this office on whether it is legal for the Louisiana Airport Authority ("LAA") to engage a lobbyist to advocate on its behalf to the legislature, the administration, or any other agency. According to your request, the LAA has entered into a contract with issue Management, LLC., wherein issue Management "agrees to provide on behalf of LAA, as directed by LAA, information regarding the Louisiana Transportation Center project to the State Legislature, the Administration and any agency deemed necessary for the success of the project and/or any other LAA business." You have cited Art.XI, Sec. 4 of the Louisiana Constitution, LSA-R.S. 24:56(F) and the City of Port Allen v. Louisiana Municipal Risk ManagementAgency, Inc., 439 So.2d 399 (La. 1983) for our review in responding to your request.
La. R.S. 2:651 et seq. created the Louisiana Airport Authority as a body politic and corporate and a political subdivision of the state. Section 651B specifically states that the purpose of the LAA is "to provide airports, airport facilities, and improvements and access thereto; to assist in construction, extending, rehabilitating, repairing, maintaining, and renewing airports and airport facilities; and to assist in the financing of such needs."
LSA R.S. 2:655(2) provides that the LAA shall have the power "To make contracts in the exercise of the rights, powers, and duties conferred upon it."
The foregoing statutory framework clearly authorizes the LAA to enter into contracts in furtherance of its statutory purposes. However, such a contract cannot circumvent state law, including the prohibited donation provisions of Art. VII, Sec. 14, of the Louisiana Constitution and the anti-lobbying provisions set forth in Art. XI, Sec. 4, of the Louisiana Constitution and La. R.S.24:56(F). *Page 2 
Article VII, Sec. 14, of the Louisiana Constitution (1974) contains the constitutional standard for the lawful use of public funds and property. This provision generally prohibits the state and its political subdivisions from loaning, pledging or donating public funds, assets or property to persons, associations or corporations, public or private. The Louisiana Supreme Court's interpretation of La. Const. Art. VII, Sec. 14, as set forth inCity of Port Allen v. Louisiana Mun. Risk, 439 So.2d 399 (La. 1983), states: ". . . this Section is violated whenever the state or a political subdivision seeks to give up something of value when it is under no legal obligation to do so." The requirement of a legal obligation to expend public funds or use public property is the threshold predicate for the constitutionality of such an expenditure or use. As such, the expenditure of public funds where expressly prohibited by law precludes such a legal obligation and would constitute a constitutionally prohibited donation.
Article XI, Sec. 4, of the Louisiana Constitution provides that "No public funds shall be used to urge any elector to vote for or against any candidate or proposition, or be appropriated to a candidate or political organization. This provision shall not prohibit the use of public funds for dissemination of factual information relative to a proposition appearing on an election ballot."
LSA-R.S. 24:56(F) provides that "No state employee in his official capacity or on behalf of his employer shall lobby for or against any matter intended to have effect of law pending before the legislature or any committee thereof. Nothing herein shall prohibit the dissemination of factual information relative to any such matter or the use of public meeting rooms or meeting facilities available to all citizens to lobby for or against any such matter."
Our office has previously interpreted these provisions to prohibit the use of public funds or public employees from being involved in any lobbying activity. See Ag. Op. No. 98-40, (Local school boards and their employees are prohibited from engaging in lobbying activities.), Ag. Op. No. 90-126A, (Use of public funds by political subdivision for a public relations campaign by state officers or agencies, as opposed to providing public information, was unlawful unless expressly authorized by the constitution or by statute.)
As noted above, La. R.S. 2:655(2) authorizes the LAA to enter into contracts with private entities, such as Issue Management, LLC., to carry out its purpose in establishing and providing airports, airport facilities, and improvements and access thereto. The LAA may provide information to the legislature, the administration and other agencies, but may not engage, directly or through contractual agreements, in lobbying activities expressly prohibited by La. Constitution Art. XI, Sec. 4, and R.S. 24:56(F). *Page 3 
Accordingly, it is the opinion of this office that the Louisiana Airport Authority may not use public funds, engage public employees or enter into contracts for the purpose of lobbying as prohibited by La. Constitution Art. VII, Sec. 14; Art. XI, Sec. 4; and R.S. 24:56(F).
We trust this adequately responds to your request. If you have any questions or comments, please do not hesitate to contact our office.
With kindest regards,
 Very truly yours,
 CHARLES C. FOTI, JR.
 ATTORNEY GENERAL
 BY: __________________________
 RICHARD L. MCGIMSEY
 Assistant Attorney General
 *Page 4 
 ATTACHMENT
 June 17, 1998
 OPINION No. 98-40
Mr. James V. Soileau 62-B LEGISLATURE — Acts Bills
Executive Director 90-A-1-(b) PUBLIC FUNDS AND CONTRACTS —
Louisiana School Boards Professional Services
 Boards Association La. Const. Art. XI, § 4 La. R.S.
 24:56 La. R.S. 42:1118
7912 Summa Avenue
Baton Rouge, LA 70809 The LSBA may hire a lobbyist in the absence of any
 legislation or rule to the contrary.
Dear Mr. Soileau:

You have requested an opinion from this office concerning the following:
 Can the Louisiana School Board Association, hereinafter referred to as LSBA, legally pay for services of a professional lobbyist or of a professional lobbying firm from its revenues for the singular purpose of legislative lobbying? If so, what limitations would be placed on the amount of funds that could be used for such lobbying services?
Louisiana law does restrict the use of public funds and the activity of public employees for the purpose of lobbying. See e.g. La. Const. Art. XI, § 4; R.S. 24:56; R.S. 42:1118; and R.S.43:31. However, even when it is clear that either public funds or public employees are involved, the above restrictions do not prohibit the dissemination of factual information. See above citations and Attorney Opinion Nos. 90-126 and 90-126(A).
In the case of the LSBA, inquiry must be made into whether public funds or public employees are involved in the lobbying activity, and so implicate the above restrictions. The LSBA may be generally grouped into a category of entities referred to as "quasi public." Quasi public entities are very diverse, are defined differently for different purposes and share very few common traits. Each quasi public entity must be examined separately to determine if a particular statute applies to it. Therefore, our response on this matter to the LSBA may not be applicable to a different quasi public entity. *Page 5 
The LSBA may be grouped as a quasi public entity because it is funded by dues paid by local school boards, and takes positions on matters of common concern to local school boards in the place of or in addition to local school boards. Local school boards operate on public funds and employ public employees. The above cited restrictions to the extent they are applicable to political subdivisions of the state, therefore, would restrict the lobbying activities of local school boards.
On the other hand, restrictions on the use of public funds do not always apply to money once it is spent by the public entity to which it is appropriated. In the case of the LSBA, for example, it would appear that the legislative auditor has no authority to audit its financial statements. R.S. 24:513(A). Moreover, contracts entered into by the LSBA do not appear to be subject to the Procurement Code. R.S. 39:1481 et seq.; see also, R.S. 38:2211 et seq. In short, statutory law does not appear to treat LSBA's operating funds as public funds.
Moreover, the above is also a factor in determining if its employees or contractors are public employees therefore subject to certain lobbying restrictions. If its funds are not public, its employees may also arguably not be public.
The LSBA is not created by law. Its employees are not elected or appointed by law, nor are they members of public retirement systems. The actions of its employees have not resulted in liability to the state, nor have their action been deemed "state action" for purposes of 42 U.S.C. § 1983. Finally, as yet, the LSBA has never been found to be subject to the Open Meetings Law, R.S. 42:1 et seq., or Public Records Act, R.S. 44:1 et seq.
Additionally, it should be noted that the LSBA has provided the legislature with factual information in the past. Even if its activities may not have been properly characterized as lobbying in the past, its views certainly have reflected the views of the school boards that are its members. The legislature has not seen fit to specifically regulate its activity in this regard. The absence of specific regulation of an activity that affects the body that is uniquely capable of subjecting it to regulation is significant.
In sum, the LSBA can pay for the services of a professional lobbyist, in the absence of any law or regulation to the contrary.
It would appear that the above interpretation is consistent with the general development of the law, to this point in time, on this matter. Atty. Gen. Opinion Nos. 75-124 and 75-952. *Page 6 
It should be noted that this opinion, as stated above, may not be applicable to other quasi public entities. Nor would it be applicable to any entity created by any public employee(s) or body(ies) in order to bypass the restrictions on lobbying.
Very truly yours,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 By: __________________________ JAMES C. HRDLICKA Assistant Attorney General
RPI/JCH:lrg *Page 7 
 MARCH 13, 1990 OPINION NUMBER 90-126
 63 — LEVEES. DRAINAGE DISTRICT FLOOD
Honorable George H. Ware, Jr. CONTROL
District Attorney LSA-R.S. 38:3302
20th Judicial District LSA-R.S. 38:3306
P.O. Box 8428
Clinton, LA 70722-8428 Amite River Basin Commission has no
 statutory authority to expend public funds
 for public relations of lobbying.

Dear Hal:
You have requested an opinion as to whether the Amite River Basin Commission ("the Commission") is authorized by its enabling statutes to use public funds to hire a public relations firm for lobbying activity — "professional help to get [the Commission's] message across to local and state officials."
The answer is negative; such use of public funds for public relations by the Commission is ultra vires.
The Amite River Basin Commission is a statutory creature of the Louisiana legislature. It has no inherent power and authority. It has only those powers delegated to it by the legislature through its enabling statutes.
LSA-R.S. 38:3306 states the powers of the Commission, including rule-making powers, drainage control authority, construction and maintenance authority, surveying and expropriation authority. All of these powers are incidental to the purpose of the Commission: ". . . to establish adequate drainage, flood control and water resources development to include but not be limited to construction of reservoirs, diversion canals, gravity and pumped drainage systems, and other flood control works." LSA-R.S.38:3302.
There is no statutory authority for the Commission to expend public funds for a public relations campaign to enhance its political reputation or its budgetary and fiscal health. Such expenditures would be without lawful authority. *Page 8 
Trusting this to be of sufficient information, I am
Sincerely,
 WILLIAM J. GUSTE, JR. Attorney General
BY: __________________________ Charles J. Yeager Assistant Attorney General CJY:tm *Page 9 
 OPINION NUMBER 90-126A April 4, 1990
 15-A — CONSTITUTIONAL LAW
 90-A-1 — PUBLIC FUNDS CONTRACTS
 La. Const. Art. XI, Sec. 4 (1974)
 La. Const. Art. VII, Sec. 14 (1974)
Mr. Jeff M. David LSA-R.S. 18:1465
Vice-Chairman
Amite River Basin Commission Public funds generally may be used for
P.O. Box 1685 public information function to provide
Denham Springs, LA 70727-1685 citizenry with factual information about
 government: use of public funds to
 manipulate public opinion is ultra vires and
 unconstitutional, unless expressly
 authorized by legislature. Original opinion
 is affirmed.

Dear Jeff:
You have requested a reconsideration of the original opinion herein which found the use of public funds by the Amite River Basin Commission for a public relations campaign to be unauthorized by statute. You have provided the minutes of the regular November 14, 1989 meeting of the commission which memorialize the decision of the commission to hire a public relations agency "for public relations assistance," and requested that the reconsideration opinion focus upon the language of the minutes and reach a specific conclusion as to whether the November 14, 1989 minutes evidence the performance of a prohibited act by the Amite River Basin Commission.
Opinion No. 90-126 answered, in the abstract, a narrow and hypothetical question of law, tendered in the abstract. Opinions of the Attorney General are conceptual; they cannot by their nature find facts, but only answer questions of law.
In reaching its conclusion that the use of public funds for a public relations campaign by state officers or agencies was unlawful unless expressly authorized by the constitution or by statute, the original opinion suffered a misleading ambiguity by its failure to distinguish between "public relations" and "public information." While the conclusion of the original opinion was correct and is hereby affirmed, the facial legality of the Amite River Basin Commission's action of November 14, 1989 can only be analyzed if the legal distinction between lawful public information and unlawful public relations is clearly elucidated. *Page 10 
The Louisiana Constitution of 1974 and the Election Code in Title 18 of the Revised Statutes clearly make this distinction with regard to elections on tax referenda, an issue which may be present in the commission's use of these public funds for "public relations assistance." As the result, the distinction generally between the valid governmental function of public information
and the ultra vires activity of public relations is well settled in Louisiana law.
La. Const. Art. XI, Sec. 4 (1974) provides:
 No public funds shall be used to urge any elector to vote for or against any candidate or proposition, or be appropriated to a candidate or political organization. This provision shall not prohibit the use of public funds for dissemination of factual information relative to a proposition appearing on an election ballot. (Emphasis added.)
This provision has been held to be self-operative, without need of enabling legislation. Godwin v. East Baton Rouge ParishSchool Board, et al., 372 So. 2d 1060 (La.App. 1st Cir. 1979). Its violation gives rise to civil remedies; Godwin recognized the viability of causes of action for declaratory judgment and a money judgment for reimbursement of the public funds brought by taxpayers for violation of Art. XI, Sec. 4. Ibid. Such prohibited use of public funds would also create a civil cause of action for an injunction against prospective violations of the constitutional norm. Connick v. Lucky Pierre's, 331 So. 2d 145
(La.App. 1st Cir. 1972).
Finally, because the duty created by Art. XI, Sec. 4 is self-operative, its breach may create criminal culpability under LSA-R.S. 14:134(1)(2) (Malfeasance: a felony).
Godwin, by its interpretation of Art. XI, Sec. 4, concludes that at least with regard to tax referendum elections (or contemplated, planned elections), the line between legality and illegality is that between advocacy of only one side of the public issue through use of public funds and the neutral statement of facts pertinent to all sides of an issue and presented without bias. "Public relations" includes, but is not limited to, lobbying, which is advocacy directed toward government rather than the public at large. *Page 11 
The original opinion herein imputed the former meaning to "public relations" — that original American art which selects and contextualizes the facts or information communicated in order to create a desired body of public opinion which is favorable and compliant to the point of view or political entitlement of the public officer or public entity. Public relations in government generally results in the manipulation of public opinion for the benefit of some private or political goal. It is publicly financed political advocacy, and it is unfair and unlawful precisely because it deprives those citizens who are opposed to the private or political result sought, but at issue, of a level playing field with government. The prohibited advocacy in connection with elections explicated by Godwin's definition of "urge" in the constitutional provision may be adopted generally for definition of the distinction between public relations and public information. The legal authority for the latter activity of government is subsumed within the constitutional or statutory empowerment of that public officer's or public entity's authorized government function; whereas there is never legal authority for the use of public funds for the former (public relations advocacy) unless expressly authorized by the constitution or statutes. Godwin makes the first part of the distinction as follows:
 "Urge" as used in Art. XI, Sec. 4 means to promote, take a position favorable or opposed to a particular candidate or proposition, or openly and publicly seek the election or defeat of a particular candidate, or the passage or defeat of a proposition submitted to the electorate. Godwin, supra, at 1064. (Emphasis added.)
In a definition also adopted herein for general application to this issue without limitation to election campaigns, Godwin
ruled that for the expenditure of public funds to qualify for the public information exception to the prohibition of Art. IX, Sec. 4, the information compiled and communicated through the use of public funds must be free from the presence of all advocacy and argument. It cannot be selective in its presentation and contextualization of information and thereby present only one side of the issue. "Public information" may be also defined generally as that which Art. IX, Sec. 4 authorizes in election campaigns to be supported by public funds: *Page 12 
 . . . factual information relative to a proposition appearing on an election ballot [which] encompasses all empirical data required by the public to intelligently decide whether to vote for or against the issue. . . . Such information [must be] purely factual and suggest no position for or against and make it clear that the data is published and disseminated solely and only for informational purposes. Godwin, supra, at 1064 (Emphasis added.)
The Attorney General adopts the distinction between "public relations" and "public information" stated by the Louisiana Constitution, as interpreted and explained by the Godwin, and applies it to the question of the proper expenditure of public funds for communications activity by government in state government's ordinary, everyday course of business. Without specific, express authorization from the legislature by statute (i.e. drug education, economic development, etc.), the use of public funds to finance public relations techniques to manipulate public opinion on public issues to create a body of public opinion favorable to a public official or entity, is ultravires. The use of public funds to provide a public information function to a state office is integral to its constitutional and/or statutory power and function, and is lawful if its intent is to be factually informative to the public.
The public information function recognized as lawful here is not only consistent with democratic values but essential to conformation to them by government. Even the communist world, in its startling intended transformation into democratic polities, recognizes the essentiality of fact-based and honest information to the public from government — they call it glasnost.
Public trust requires the citizenry to have access to accurate information to evaluate and judge the honesty, fairness and efficiency of government. Fact-based information also facilitates public respect for the lawful exercise of authority by government, when such exercise of authority, if not understood, might be popularly contested or obstructed.
The legal issue here is teleological. The expenditure of public funds for this type of communications activity is not unlawful per se. It is the purpose for which the public funds *Page 13 
are spent, and the intent of the public agency or official which makes the expenditure, which controls the legal character of the expenditure. While intent must always be inferred from acts or circumstance, and its true nature difficult sometimes to precisely determine because it is a question of fact, nonetheless it serves as the test we herein adopt as the bright line between legality and illegality, both in election campaigns and in the general course of business by state government.
The Attorney General, in an earlier opinion personally written by Mr. Guste, has recognized this standard in his enforcement of "constitutional prohibitions against the use of public funds for private and political purposes." Opinion of the Attorney General No. 76-307.
The legal test stated by the Attorney General was reaffirmed in Opinion of the Attorney General No. 79-1191, which disallowed the use of public funds to pay for a newspaper advertisement addressing a proposed constitutional amendment. The Attorney General disallowed the use of public funds because "the proposed advertisement takes a stand in the support of passage of constitutional amendment No. 1 and does not desseminate purelyfactual information." (Emphasis added.)
Several other points should be made concerning the rule stated in this opinion and derived from the constitution, statutes and jurisprudence.
Art. XI, Sec. 4 is enabled by a statute in the Election Code, LSA-R.S. 18:1465. The statute duplicates the prohibitory language of the constitutional provision, but further provides a criminal penalty for its violation.
Violation of the Constitution or the Election Code provisions does not invalidate or delegitimate any election in which the illegal use of public funds occurred. Rather than nullification of the election results, the proper remedy in law is criminal prosecution. Concerned Business and Property Owners of DeSoto,Inc. v. DeSoto Parish School Board, 528 So. 2d 567 (La.App. 2nd Cir. 1988).
Violation of this rule may result in criminal penalities under another statute. LSA-R.S. 43:31D prohibits the use of public funds appropriated for printing for the partisan or public relations purposes prohibited by Art. XI, Sec. 4 and R.S.18:1465, subject to the same exception *Page 14 
authorizing the use of public funds to desseminate "factual information relative to a proposition on any election ballot." Violation of Sec. 31D creates culpability for a criminal penalty under R.S. 43:31F.
Finally, another constitutional provision justifies the extension of the legal standard of Art. XI, Sec. 4 to the general course of business by all governmental entities, state, local and parochial, including state boards, commissions and districts. La. Const. Art. VII, Sec. 14 (1974) characterizes as illegally gratuitous those expenditures of public funds which are not mandated by a legal obligation or subsumed by legal duty. Cityof Port Allen v. Louisiana Mun. Risk Management Agency, Inc.,439 So. 2d 399 (La. 1983). Without a legal obligation to engage in public relations created by a statutory delegation of the power and duty to do so by the legislature, neither the commission nor any other state officer and agency may do so. Because of the use of public funds, the lack of authority in the enabling statute identified as ultra vires in the original opinion rises to the level of a constitutional violation not limited to the presence of a tax referendum on a ballot as in the case of Art. XI, Sec. 4. No government entity or officer, without a legal obligation created by an authorizing statute, may use public funds to attempt to wrestle public opinion to rest on one side of a public issue of moment to the public interest or to government. The constitution denies the use of public funds to finance the advocacy of the self-interest of any state agency or officer. Lobbying is likewise barred where financed by public funds; it is but an included instance of the same malumprohibitum, except it is directed at manipulating and influencing government action rather than public opinion.
It is crucial to note that the core prohibition of the doctrine expounded herein is the use of public funds. The law values and protects the most passionate, eloquent and totally one-sided expression of conviction regarding public issues by both public officials and citizens alike. The members of the Amite River Basin Commission are constitutionally entitled, and protected, to make the most vociferous public argument possible for the construction of a reservoir to alleviate the profound drainage problem within their district — as long as they do not use public funds to potentiate their entreaty of the collective opinion of the electorate. Godwin carefully noted this point: *Page 15 
 . . . the provision [Art. XI, Sec. 4] is designed to prevent public officials from using public funds to support or oppose candidates, parties or propositions. We note particularly that the provision does not prohibit public officials from supporting or opposing candidates, parties or propositions with their personal funds and resources, which admittedly they have a right to do. It only prevents their doing so with public funds. Supra, at 1063. (Emphasis added.)
With regard to your opinion request, there is nothing facially illegal about the action of the commission that is memorialized in the November 14, 1989 minutes. There is nothing illegal in a state agency with statutory authority to ameliorate flooding and drainage problems to spend money for professional help in preparing a public information slide presentation which empirically and factually informs the citizenry and government officials of the actual nature of the flooding and drainage crisis in the Amite River Basin Drainage District, without seeking public or official support for the affirmative side of any tax referendum which must be electorally approved in order to authorize the levy of a 3 mill ad valorem tax under LSA-R.S.33:3309 to finance the construction a new reservoir to alleviate the flooding.
Hence it is superficial to judge the legality of the acts of the commission on the basis of the minutes alone. The correct legal question is not whether the funds were authorized but what was the nature of the slide presentation prepared by the public relations agency hired with public funds, and how was it used? Did it advocate the approval of a tax referendum to authorize a 3 mill ad valorem tax to generate sufficient revenue to build a reservoir? Did the slide presentation present the opposite view — the alternatives available to alleviate the flooding problem without an ad valorem tax or new reservoir?
Beyond the minutes you have supplied, I have no idea what the commission did or did not do. The minutes do not reflect the intent or purpose of the commission as to how the work product of the public relations agency would be used. Intent is a finding of fact, and that is beyond the authority of this opinion, which is restricted to questions of law. The *Page 16 
power to find facts is a judicial and a quasi-judicial one, and the question of intent must be deferred to the appropriate district court and district attorney, respectively.
However, until the appropriate judicial officer may find differently, the act of the Amite River Basin Commission in expending these funds for "public relations assistance" is presumed lawful, and the Attorney General so presumes. LSA-R.S.15:432.
Trusting this to be of sufficient information, I am
Sincerely,
 WILLIAM J. GUSTE, JR. Attorney General
 By: __________________________ CHARLES J. YEAGER Assistant Attorney General *Page 17 
 April 7, 1974 OPINION: 75-124 Mr. Harold E. Forbes, Director Louisiana Commission on Governmental Ethics P.O. Box 44111 Baton Rouge, Louisiana 70804
Dear Mr. Forbes:
In your letter of January 27, 1975, you have requested that this office render an opinion as to whether funds of the State of Louisiana may be used to pay dues in associations and, if so, whether the records of such associations are subject to public inspection and audit.
The Louisiana Constitution of 1974, in Article VII, Section10(D), provides, as follows:
"No appropriation shall be made except for a public purpose."
The Louisiana Constitution of 1974 in Article VII, Section 14
reads as follows:
 "Section 14. Donation, Loan or Pledge of Public Credit.
 "Section 14. (A) Prohibited Uses. Except as otherwise provided by this constitution, the funds credit, property, or things of value of the state or any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private. Neither the state nor a political subdivision shall subscribe to or purchase the stock of a corporation or association or for any private enterprise. (Emphasis added).
 (B) Authorized Uses. Nothing in this Section shall prevent (1) the use of public funds for programs of social welfare for the aid and support of the needy; (2) contributions of public funds to pension and insurance programs for the benefit of public employees; or (3) the pledge of public funds, credit, property, or things of value for public purposes with respect to the issuance of bonds or other evidences of indebtedness to meet public obligations as provided by law. *Page 18 
 "(C) Cooperative Endeavors. For a public purpose, the state and its political subdivisions or political corporations may engage in cooperative endeavors with each other, with the United States or its agencies, or with any public or private association, corporation, or individual.
 "(D) Prior Obligations. Funds, credit, property, or things of the state or of a political subdivision heretofore loaned, pledged, dedicated, or granted by prior state law or authorized to be loaned, pledged, dedicated, or granted by the prior laws and constitution of this state shall so remain for the full term as provided by any contract, unless the authorization is revoked by law enacted by two-thirds of the elected members of each house of the legislature prior to the vesting of any contractual rights pursuant to this section."
The question, therefore, is whether the payment of dues by the State or any of its political subdivisions to an association is prohibited by these sections of the Constitution of Louisiana.
For many years officials and agencies of Louisiana's state and local government have had memberships in national, regional and state associations, and the dues to these associations and the expenses connected with participation in the work of these associations have been paid from appropriated public funds.
Governors' conferences, legislators' conferences and judicial conferences are held annually at which officials meet and exchange ideas and information relative to the operation of their offices. The Council of State Governments, the National Association of Secretaries of State, the National Association of Attorneys General, the National Association of Counties, the National Association of State Departments of Agriculture, the National Association of Auditors, Treasurers and Comptrollers are all associations which were created to serve the public purpose of facilitating the exchange of ideas, programs and solution of public problems common to public officials holding the same office in different states. In addition, parochial officials such as sheriffs, district attorneys, levee board *Page 19 
members, school board officials and other state administrative officials have belonged to associations and have attended meetings of these associations. At these meetings, they discuss public problems common to their respective offices. Sheriffs seek to exchange ideas on the best law enforcement procedures. District Attorneys through their association and meetings keep current on criminal law development as it relates to the role of a prosecutor. Levee board members accumulate information with regard to needed levee repairs and improvements and send representatives to Washington to seek funds for Louisiana to implement needed improvements. School board officials meet to discuss problems common to our public schools in an effort to upgrade the education of the state's children.
In addition to holding meetings, associations of these officials provide newsletters and other publications which aid their members in conducting the affairs of their public agencies.
In the case of James v. Rapides Parish Police Jury, (1959),113 So. 2d 88, the Court interpreted Article IV, Section 12 of the 1921 Constitution — the source of Article VII, Section 14 of the Louisiana Constitution of 1974. The Court held that where there was nothing in the record from which the Court could establish that money paid by a public body to an association was for services, such payments would amount to a prohibitied grant or donation.
To put it conversely, the dictum of the James case is that had there been services rendered to or for the public body by the private associations, the payment by that public body to the association would not have constituted a gratuitous donation prohibited by the constitution. It would have constituted a payment for services.
Courts in other states initially took the position that provisions in their constitutions similar to Article VII, Section 14(A) in our new Constitution, prohibited the use of public funds for dues to these associations. See City of Phoenix v. Michael,148 P. 2d 353 (Ariz. 1944) (Dues to the Arizona Municipal League).
The courts in other states changed their position when they became convinced that the better, more modern view was that a public purpose was served when, for example, a city could: *Page 20 
 ". . . expend some of its funds in a reasonable effort to learn the manner in which complex municipal problems, arising from the operations involving both its governmental and proprietary capacities, are being solved in sister cities of the state, thereby improving the quality of service it renders its own taxpayers." City of Glendale v. White, 194 P. 2d 435 (Ariz. 1948), overruling City of Phoenix v. Michael, supra.
We, therefore, must conclude that where a public service is provided and a public purpose is served by state officials and agencies subscribing to membership in associations of public officials and attending conferences of the members of such associations, the payment of dues and conference fees by the public agency to such association is a permissible use of public funds.
By serving a public purpose, the associations may receive appropriated public funds in the form of dues under Article VII, Section 10(D) of the new Constitution. By rendering a public service, the associations are not receiving a donation of public funds prohibited by Article VII, Section 14(A) of the new Constitution.
Each responsible elected state official and each agency or political subdivision of state government has the initial responsibility of determining
(1) whether or not a public purpose is served;
 (2) whether or not public services are received by his or its participation in any particular association; and
 (3) whether or not the services performed are commensurate with the amount of the dues paid by the public agency to the association.
However, as with the expenditure of all public funds, the final accountability is to the source of the funds, the people and their representatives. To this end, the legislature created the Legislative Auditor. *Page 21 
R.S. 49:427(A) requires that "all . . . public or quasi-public agencies or bodies or political subdivisions of the state, whose books and accounts are not required to be audited by the legislative auditor, . . . shall cause to be conducted annually by a duly qualified certified public accountant an audit and examination of their books and accounts, and shall file the same with the office of the legislative auditor, within six months after the close of the fiscal year."
Quasi-public bodies are those bodies which are not strictly private bodies. Strictly private bodies are those whose "direct objective is to promote private interests, and in which the public has no concern, . . . which derives nothing from government, except perhaps the right to be corporations . . ."State v. Riverside Irrigation Co., 76 So. 216, 218 (1917).
If an association which has as its members officials of the state or its political subdivisions, receives as its primary source of income dues paid from appropriated public funds, and serves a public purpose and renders a public service as it must to receive such appropriated public funds, then such an association is, in our opinion, a quasi-public body.
In support of this conclusion, we wish to point out that the Louisiana Legislature has adopted several provisions which recognize certain intrastate associations; Louisiana Sheriffs' Association, R.S. 33:1422; Levee Board Association, R.S. 38:285, 285.1; Louisiana Municipal Association, R.S. 33:7311; Louisiana Police Jury Association, R.S. 42:1002, R.S. 33:6191. The fact that these statutes empower officers of these associations to serve on public retirement fund boards buttresses the conclusion that these associations, and others like them, are quasi-public bodies.
Additionally, the Legislature in Senate Concurrent Resolution No. 35 of 1974 stated that the authorization of the legislative auditor extends to the accounts of private firms and individuals concerning expenditure of public funds for reports and studies. This buttresses the conclusion that the duty of the legislative auditor is to monitor the expenditure of public funds.
Another conclusion flows when an association has as its primary source of income dues paid from public funds by public officials or agencies as membership subscriptions, and serves a public purpose *Page 22 
and renders a public service. We are compelled to conclude that these facts would bring such an association under the general prohibitions on use of public funds found in the Constitution and laws of Louisiana.
For example, such an association would be prohibited under Article VII, Section 14(A) of the new Constitution from loaning or donating their funds to private persons. Such a loan or donation would be doing indirectly with state funds what is clearly prohibited directly. It is axiomatic that such indirect loans or donations are prohibited if direct loans or donations are prohibited.
In summary then, this office is of the opinion that associations may receive public funds in the form of dues paid by state officials and agencies for membership in an association, provided that the association serves a public purpose and renders a public service and provided the service rendered is commensurate with the amount of dues paid. In addition, the funds received must be used within the prohibitions on the use of state funds found in the Constitution and laws of Louisiana. By receiving such public funds the association becomes obligated to submit its annual audit to the Legislative Auditor as set out in R.S. 49:427(A).
We feel compelled to these conclusions under the law of Louisiana as presently written. It is, of course, the prerogative of the Legislature to change the law if that is its will; and a change in the law upon which this opinion is based would change the conclusions of the opinion.
If we can be of any further assistance, please advise.
Yours very truly,
 WILLIAM J. GUSTE JR. Attorney General *Page 23 
 July 17, 1975 OPINION: 75-952 61-B-LAWS 15-A-CONSTITUTIONAL LAW 90-A-POLITICAL SUBDIVISIONS R.S. 42:1101, R.S. 42:1111
R.S. 42:1142, R.S. 18:1481
R.S. 42:1112, R.S. 42:1113
R.S. 42:1143, R.S. 24:51
R.S. 39:231
Art. 254 1974, Art. 7, 14A 1974
 Mr. R. Gray Sexton Attorney for the Louisiana Commission on Governmental Ethics P.O. Box 44111, Capitol Station Baton Rouge, Louisiana 70804
Dear Mr. Sexton:
This opinion is an answer to the Commission's request for clarification of our Opinion No. 75-124, dated April 17, 1975.
In the second full paragraph on page six of the opinion it was stated:
 In addition, the funds received must be used within the prohibitions on the use of state fonds found in the Constitution and laws of Louisiana.
First, you inquire whether these prohibitions would mean that the individuals charged with the responsibility of expanding (sic) the funds received by the subject-associations would be subject to the Louisiana Code of Governmental Ethics, R.S.42:1101 et seq., the code being part of the "laws of Louisiana."
Opinion No. 75-124 stated our reasons for the use prohibitions quoted above. We said:
 Another conclusion flows when an association has as its primary source of income dues paid from public funds by public officials or agencies as membership subscriptions, and serves a public purpose and renders a public service. We are compelled to conclude that these facts would bring such an association under the general prohibitions on use of public funds found in the Constitution and laws of Louisiana. *Page 24 
 For example, such an association would be prohibited under Article VII, Section 14(A) of the new Constitution from loaning or donating their funds to private persons. Such a loan or donation would be doing indirectly with state funds what is clearly prohibited directly. It is axiomatic that such indirect loans or donations are prohibited if direct loans or donations are prohibited.
Opinion No. 75-124, p. 5-6.
As in the example of a prohibited use of public funds quoted above, i.e., prohibition to donate or loan the funds to private persons, the term "use" contemplates the utilization of the public funds per se. As also quoted above, the policy behind such a prohibition is to prevent the subject associations from being a conduit for public funds to an end-use that is otherwise clearly prohibited.
Our reading of the Code of Governmental Ethics does not disclose a prohibition on the utilization of public funds per se. However, should the jurisprudence and administrative regulations under the Code, have interpreted the Code to impose such a prohibition then such a prohibition would apply to the public funds received by the subject associations. R.S. 42:1101, ct seq.
In addition, our reading of the Code reveals that in general it applies to state employees and elected state officials, as defined in the Code. If the "individuals charged with the responsibility of expending the funds" are such employees or officials as defined in the Code then, of course, the Code would apply to them. If such individuals are not employees or officials, as defined in the Code, then the Code does not apply to them. It is our opinion that application of the Code obtains by its own provisions and the fact that an individual is responsible for the expending of public funds received by a subject association is immaterial to such application. See R.S.42:1111(G); R.S. 42:1142(A).
Second, you inquire whether the public funds received by a subject association may be used for political purposes or for a political contribution. It is the opinion of this office that the Constitution and laws of Louisiana clearly prohibit a subject *Page 25 
association from making either a direct political contribution or Loan, or financing a political activity. Art. 11, Sec. 4. Const. of 1974; Art. 7, Sec. 14(A), Const. of 1974; R.S. 18:]48] et seq.
Third, you inquire whether the employees and representatives of a subject association would be subject to the same restrictions on political activities as other state employees.
If such employees and representatives are not otherwise state employees in the classified civil service, they do not become such because they are paid by a subject association whose primary source of income is public funds. Thus, it is our opinion that the restrictions on political activities by classified civil servants, contained in Article X, Section 9 of the new Constitution cannot be extended to cover employees and representatives of subject associations who are not otherwise state employees. If such employees and representatives are otherwise classified civil servants, then they would be subject to the restrictions on political activities contained in the new Constitution, their employment by or representation of a subject association notwithstanding.
However, it is also our opinion that employment by, or representation of, a subject association by a state employee or official is violative of the outside compensation and conflict-of-interest provisions of the Code of Governmental Ethics. R.S. 42:1112, 1113, 1143.
In addition, if the political activities of the subject association and of its employees and representatives are paid for out of the public funds received by the association, such expenditures would be prohibited by the new Constitution. Article 11, Sec. 4., Const. of 1974.
Fourth, you inquire what restrictions would be placed on the employees and representatives of the subject associations as to political lobbying. We assume, from our information regarding the subject associations, that the Commission is particularly concerned with lobbying before the Louisiana Legislature and its committees.
Such employees and representatives, in our opinion, are subject to the lobbying restrictions contained in R.S. 24:51, et seq. *Page 26 
and in the Rules of the Louisiana House of Representatives and Senate.
In any case, the propriety of lobbying on the part of a subject association and its lobbyists, particularly if they are being compensated either directly or indirectly by public funds (see Opinion No. 75-124 at p. 5-6), would turn on the public purpose of the lobbying and the public service being rendered by the lobbyists.
For example, lobbying before the Legislature or its committees for a pay raise for the subject associations's members, in our opinion, would be lobbying for a private purpose and would be rendering a private service. A subject association could not use public funds received as dues for such a private purpose, nor could such an association receive public funds as dues if such a private service was rendered by the association, its employees or representatives. Art. 7, Sec. 14(A), Const. of 1974; see Opinion No. 75-124 at p. 3-4; cf. James v. Rapides Parish Police Jury,113 So. 2d 88 (La.App. 2d Cir., 1959) and City of Phoenix v.Michael, 146 P. 2d 353 (Ariz. 1944).
On the otherhand, it is our opinion that lobbying before the Legislature by a subject association can serve a public purpose and provide a public service. For example, should the Legislature as a whole, or one of its committees, feel that its deliberations on a bill might benefit from the expertise or views that a subject association, its employee or representative could offer, then the providing of such expert advice or such views, in our opinion, would be providing a public service and serving a public purpose. Therefore, this would be a lawful activity of the subject association, and a lawful use of public funds. Cf. No. 10, the Federalist (Cooke, ed., 1961) p. 36 et seq.
Fifth, you inquire whether the prohibition contained in Opinion No. 75-124 would apply to expending the public funds received by a subject association for entertainment.
As outlined in Opinion No. 75-124 and also in the paragraphs above, to lawfully receive public funds a subject association must use those funds for a public purpose and in providing a public service. This would apply equally to expenditures for *Page 27 
entertainment. Which expenditures for entertainment are for a public purpose and are providing a public service, as opposed to a private purpose and private service, in our opinion must depend on the facts of a particular case. As a general guideline for distinguishing between public and private purposes and services, the Supreme Court has stated that a public purpose is "such a purpose as redounds to the public welfare." State v. WilsonCo., 154 So. 636, 639 (1934). Thus, it would be our opinion that there would be very few cases where the use of public funds for entertainment by a subject association would redound to the public welfare, i.e., serve a public purpose. In general, such entertainment expenditures would be suspect as a prohibited use of public funds.
Sixth, and lastly, you inquire whether a subject association, its members, employees and representatives would he subject to the travel expense regulations promulgated by the Division of Administration pursuant to R.S. 39:231, as amended.
The authorizing statute states that it applies to state officers and employees "in the discharge of the duties of their respective offices and positions in the state service." As is more fully explained in Opinion No. 75-124, it is our opinion that in order for a private association to receive public funds from state agencies, officers or employees that are its members, the association must serve a public purpose and render a public service. Implicit in that opinion, and also in the James case cited therein, is that such public purpose and public service must be directly related to "the discharge of the duties of their respective offices and positions in the state service" of the officer or employee that is a member of the association.
Therefore, it is our opinion that R.S. 39:231, and the administrative regulations thereunder, apply to all state officers and employees and to all travel expenses paid out of public funds, whether the payment from public funds is made directly by the State or indirectly through a subject association. This would also include the expense limitation regulations promulgated under authority of R.S. 39:231. The annual audit submitted by the subject association to the Legislative Auditor (see Opinion No. 75-124) provides the policing mechanism for compliance with R.S. 39:231 and its administrative regulations. *Page 28 
The unregulated travel expenditures possible if R.S. 39:231 and its regulations did not apply to a subject association would be use of a subject association as a conduit for public funds to a prohibited end-use. This is just the type of indirect use of public funds contemplated in the third paragraph above, and in Opinion No. 75-124.
If we can be of any further assistance, please contact us.
Yours very truly,
 WILLIAM J. GUSTE, JR. ATTORNEY GENERAL
By: __________________________ Kendall L. Vick Assistant Attorney General KLV:rm
P.S. We assumed that the Commission would not meet during the Legislative session. Thus the delay in our response. We trust this has caused no inconvenience.